STEPHEN E. DONAHUE (SD-5100)
WILLIAM P. HICKS (not admitted in SDNY)
MARK ERIC HARRISON (not admitted in SDNY)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Atlanta Regional Office
3475 Lenox Rd., N.E., Suite 500
Atlanta, Georgia 30326-1232
(404) 842-7675

JASON R. GETTINGER   (JG -5895)
Local Counsel for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 4300
New York, N.Y. 10281-1022
(212) 336-0076



RECEIVED
SEP 2 7 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE DANIELS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| | : 07 Civ. **07 CIV 8394** |
| vs. | : |
| GREGG ASHLEY SMITH  and ELLIOT JOEL SMITH, | : |
| Defendants. | : |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Gregg Ashley Smith ("G. Smith") and Elliot Joel Smith ("E. Smith") (collectively the "Defendants"), alleges as follows:

## SUMMARY

1.   This case involves an insider trading scheme using the securities of Aspen Technologies, Inc. ("Aspen"), Regeneration Technologies, Inc. ("Regeneration") and Triangle Pharmaceuticals, Inc. ("Triangle") by G. Smith, and E. Smith, his father.

2.   From December 2001 to December 2002 (the "relevant period"), G. Smith, while employed as a Principal in the Equity Private Placements Group at Banc of America Securities, LLC ("BAS"), learned material, nonpublic information about Aspen, Regeneration, and Triangle while coordinating private investments in public equities ("PIPE") stock offerings for each of the companies. G. Smith then breached his fiduciary duty to BAS and tipped E. Smith, his father, the material, nonpublic information about Aspen, Regeneration, and Triangle.

3.   Upon being tipped by his son, and prior to the information being publicly disclosed, E. Smith purchased shares of common stock of Aspen, Regeneration, and Triangle. When the information was disclosed, the prices of the respective securities rose and E. Smith profited. In connection with his purchases

2

of Aspen, Regeneration and Triangle common stock, accounts controlled by E. Smith obtained $85,358, $11,735, and $107,383, respectively, in ill-gotten profits.

4.    Additionally, on two separate occasions during the Commission staff's investigation, E. Smith, with the assistance of G. Smith, created fraudulent documents that E. Smith provided to the Commission staff in an effort to mislead the staff as to the reasons for his trades in the stock of two of the issuers.

5.    By their conduct, G. Smith and E. Smith have engaged in, and unless restrained and enjoined by this Court, will continue to engage in acts and practices which constitute and will constitute violations of Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78j(b) and 78n(e)] and Rules 10b-5 and Rule 14e-3 thereunder [17 C.F.R. §§ 240.10b-5 and 240.14e-3].

## **JURISDICTION AND VENUE**

6.    This Court has jurisdiction of this action under Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. 78u(d), 78u(e), 78u-1 and 78aa].

7.    Venue for this action is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(b)(1) and (2); and Section 27 of the Exchange Act [15 U.S.C. §78aa] because certain of the actions set forth herein that constitute violations of the Exchange Act occurred within the Southern District of New York and because the defendants reside in and transact business within the District.

3

## THE DEFENDANTS

8.   **G. Smith**, age 37, is a resident of New York, New York.  During the relevant period, G. Smith was employed with BAS as an investment banker and Principal in BAS's Equity Private Placements Group.  G. Smith holds NASD Series 7 and Series 63 licenses.

9.   **E. Smith**, age 75, is a resident of New York, New York and is the father of G. Smith.  During the relevant period, E. Smith was employed as the Managing Director of Broadband Capital Management, LLC ("Broadband Capital"), a registered broker-dealer.  E. Smith was a founding member and a Director of the Chicago Board of Options Exchange from 1972-1975, a Director of the American Stock Exchange from 1975-1981, a Board member of the Securities Industry Automation Corporation from 1975-1981, and a Director of the New York Institute of Finance from 1972-1980.  He holds NASD Series 7, 21, 24 and 63 licenses.

## RELATED ENTITIES

10.  **Aspen** is a company that provides computer software and related services to the petroleum, chemical, and pharmaceutical industries.  During the relevant period, Aspen derived approximately 50% of its revenue from the sale of computer software licenses.

11.  **Regeneration** is a company that processes human tissue for use as implants in orthopedic and other surgeries.  During the relevant period,

Regeneration made approximately 53% of its net revenues from a distribution

agreement with Medtronic Sofamor Danek ("Medtronic").

12. **Triangle** was a small pharmaceutical company located in North

Carolina. Triangle contacted BAS in the fall of 2002 to assist it in raising capital

for the purpose of developing and marketing Coviracil, a drug used to treat patients

with HIV.

## THE INSIDER TRADING SCHEME

13. From December 2001 to December 2002, E. Smith and G. Smith

engaged in a fraudulent insider trading scheme. During that period, G. Smith was

employed as a Principal in the Equity Private Placements Group at BAS. G. Smith

had a fiduciary relationship with BAS which would be violated by his improper

and unauthorized disclosure of information obtained in connection with his duties

and intended to be used for the business purposes of BAS and its clients.

14. E. Smith was aware at all relevant times that G. Smith would be

violating his fiduciary duty if G. Smith disclosed for unauthorized purposes

information obtained in connection with his duties at BAS.

15. In violation of his fiduciary duty, G. Smith repeatedly disclosed material

nonpublic information he obtained in connection with his employment at BAS to

E. Smith. As described below, E. Smith purchased various securities based upon

that information.

16. E. Smith placed his illegal trades in accounts that he controlled in the names of his spouse and one or more of three entities which he also controlled, namely Praefero Partners, Wireless Acquisition Partners ("Wireless") and Saratoga Holdings, Inc. ("Saratoga"). During the relevant period, G. Smith was president of Saratoga and received by mail the brokerage statements of Saratoga reflecting transactions in the Saratoga account. G. Smith was also a part owner of Wireless during the relevant period.

### Aspen Trades

17. On or about December 14, 2001, while working on a potential PIPE for Aspen, G. Smith learned that the company expected to sign two large licensing agreements before the quarter end on December 31, 2001.

18. Because Aspen derived as much as 50% of its revenue from licensing agreements, the fact that it was signing two new large agreements would have a significant and material impact on its future earnings.

19. During the next several days, G. Smith was in frequent communication via email with Aspen personnel and continued to work on Aspen's potential PIPE transaction.

20. On Wednesday, December 19, 2001 at 10:06 a.m., G. Smith placed a two-minute phone call to E. Smith's work phone and, in violation of his fiduciary

6

duty to BAS, informed his father about Aspen's two profitable licensing agreements.

21. Approximately six minutes after speaking with his son on December 19, based upon the tipped information, E. Smith purchased 2,000 shares of Aspen stock. Forty minutes thereafter, E. Smith purchased an additional 2,000 shares of Aspen stock.

22. On December 20, 2001, at 9:42 a.m., E. Smith purchased an additional 1,000 shares of Aspen stock.

23. On December 21, 2001, Aspen executed the two large licensing agreements anticipated on December 14.

24. On December 21, 2001, subsequent to the execution of the licensing agreements, G. Smith had two telephone calls in mid-afternoon with Aspen's Chief Financial Officer and learned of the execution of the licensing agreements. After speaking to Aspen's CFO the second time, G. Smith participated in an unrelated but previously scheduled conference call that lasted approximately 40 minutes. Almost immediately after concluding that conference call, G. Smith spoke to his father for three minutes and tipped him about Aspen's execution of the licensing agreements. Three minutes later, based upon the tipped information, E. Smith purchased 2,000 more shares of Aspen stock.

25. From December 27, 2001 through January 10, 2002, E. Smith purchased additional shares of Aspen stock on fourteen occasions. During this time, nine of E. Smith's fourteen purchases occurred within minutes of a phone call with G. Smith.

26. At 1:54 p.m. on January 14, G. Smith emailed Aspen's CFO and recommended that Aspen price the PIPE offering based on Aspen's stock's price five days after the company's January 23 quarterly earnings announcement. He explained to the CFO that this recommendation was due to her "confidence in the quarter" and would allow the company the benefit of a potential share price appreciation after the January 23 earnings release.

27. G. Smith called his father twice on January 14. The first call occurred two hours before he emailed Aspen's CFO, and the second call occurred at 3:04 p.m. after sending the email. Three minutes after the second call, based upon the tipped information, E. Smith purchased 1,500 shares of Aspen stock. More purchases occurred on January 23, the day of Aspen's scheduled earnings announcement, when G. Smith again called his father twice. The first call was at 12:44 p.m. for one and half minutes, and the second occurred at 12:49 p.m. for twelve seconds. Thirteen minutes after the second call, E. Smith purchased another 8,900 Aspen shares—his largest single day purchase of Aspen stock. After

completing that purchase, E. Smith owned or controlled 33,900 shares of Aspen common stock for which he had paid over $554,268.

28.  On January 23, after the close of the markets, Aspen issued its quarterly earnings release, announcing one of the licensing agreements and disclosing that (i) Aspen's total revenues were $82 million, exceeding the company's earlier announced projection of $75 million to $77 million in total revenue, (ii) its licensing revenues had more than doubled during the quarter, and (iii) excluding expenses related to its investment in a wholly owned subsidiary, the company had achieved earnings per share of $0.06.

29.  On January 24, 2002, following the earnings announcement, Aspen's share price closed at $19.60 per share with an average daily volume of 3,089,600, representing an increase of $3.51 per share from the previous day's closing share price of $16.09 and a gain in trading volume of 509%.

30.  On January 24 and 25, following the earnings announcement, E. Smith sold all but 4,000 shares of his Aspen stock, resulting in $72,168 of realized gains. When combined with $13,190 of unrealized gains on his Aspen purchases, E. Smith and accounts controlled by him, including Wireless Acquisition Partners, an entity in which he held a 44.26% interest and G. Smith held a 37.65% interest, obtained over $85,358 in ill-gotten gains.

## Regeneration Trades

31. Between April and June 2002, G. Smith and BAS were working on a PIPE for Regeneration which had been delayed while Regeneration pursued negotiations to restructure a significant distribution agreement it held with Medtronic—an agreement from which Regeneration derived 53% of its net revenues.

32. On June 6, 2002, G. Smith made five attempts to call Regeneration's Chief Executive Officer to ascertain the status of Regeneration's negotiations with Medtronic and spoke with the CEO only once for less than a minute.

33. At 10:27 a.m. on June 7, 2007, G. Smith spoke to Regeneration's CEO and learned that Regeneration and Medtronic had executed a term sheet for a renegotiated distribution agreement that increased the fees paid to Regeneration for its efforts under the agreement in an amount material to the revenues of Regeneration.

34. After hanging up with Regeneration's CEO, G. Smith immediately called and tipped his father about the execution of the term sheet during a conversation that lasted 54 seconds. At 10:36 a.m., only minutes after speaking to his son, based upon the tipped information, E. Smith made his first investment in Regeneration by placing an order to purchase 2,400 shares of Regeneration

common stock. By the end of the day, E. Smith had purchased a total of 7,000 Regeneration shares.

35. On June 10, 2002, at 10:18 a.m., Regeneration's CEO told G. Smith that Regeneration's Board had approved the new agreement with Medtronic.

36. Immediately after speaking with Regeneration's CEO, at 10:22 a.m., G. Smith called and tipped his father of the Board's approval during a one minute conversation. Approximately two minutes later at 10:25 a.m., based upon the tipped information, E. Smith purchased 1,400 more shares of Regeneration stock. Less than 20 minutes later, E. Smith purchased another 600 shares.

37. By June 14, 2002, E. Smith owned or controlled a total of 11,000 Regeneration shares.

38. On June 19, 2002, prior to the opening of the markets, Regeneration announced its new distribution agreement with Medtronic. On June 20, Regeneration's share price closed at $6.15, an increase of 24% over the closing share price the day before the announcement and a 52% increase in trading volume. Between June 19, 2002 and June 26, 2002, E. Smith and accounts controlled by him sold all 11,000 shares of his Regeneration shares and realized a profit of $11,735.

### Triangle Trades

39.  In the fall of 2002, Triangle was in the process of developing and marketing a drug, Coviracil, to treat patients infected with HIV.  To obtain additional funding for these efforts, Triangle engaged BAS to assist in pursuing simultaneously two alternatives:  arranging a PIPE transaction, for which BAS was to be the lead underwriter, or seeking merger or acquisition offers for Triangle.

40.  On or about October 31, 2002, in anticipation of a PIPE organizational meeting at Triangle's headquarters on November 1, G. Smith learned in connection with BAS' work assisting Triangle in being acquired, that Triangle was the subject of a possible acquisition offer by Gilead Sciences, Inc. ("Gilead").  The offer was a stock-for-stock transaction that gave Triangle's stock a valuation of $5.00 per share.

41.  On the evening of October 31, 2002, G. Smith called his father's office and parents' residence a total of five times and tipped his father about the Gilead offer.

42.  The following morning, at 9:25 a.m., 9:33 a.m., and 9:34 a.m., based upon the tipped information, E. Smith placed orders to purchase 5,000, 2,500 and 5,000 shares of Triangle stock, respectively.

43.  Thereafter, at 11:20 a.m. on November 1, 2002, during the PIPE kick-off meeting, G. Smith called his father for four minutes.  Then, ten minutes after

the conclusion of that call, at 11:34 a.m., E. Smith purchased an additional 3,000 shares of Triangle stock, bringing his total purchase of Triangle stock for the day to 15,500 shares.

44. On November 12, 2002, BAS' PIPE group received approval to serve as the lead underwriter for Triangle's PIPE. That same day, Gilead revised its tender offer to Triangle from $5.00 worth of stock for each share of Triangle stock to $5.50 worth of stock for each share of Triangle stock. Due to the increased likelihood of a merger offer due to the revised offer from Gilead, Triangle decided to postpone the PIPE to allow Triangle to focus on its merger discussions.

45. On the evening of November 12, G. Smith called his father's residence on three occasions and informed his father about Gilead's revised offer to acquire Triangle. The following morning, between 9:35 a.m. and 11:44 a.m., based upon the tipped information, E. Smith effected purchases of an additional 11,500 shares of Triangle stock. On several following days, namely, November 14, 15, and 18, E. Smith purchased an additional 4,000 shares, 2,500 shares and 6,500 shares, respectively, of Triangle stock based upon his son's tip.

46. On November 26, Triangle received a third and final tender offer from Gilead, in which Gilead proposed acquiring Triangle for $6.00 per share. Knowing that Gilead was likely to acquire Triangle, G. Smith called his father seven times from his office between 9:40 a.m. and 12:00 noon and advised him about the new

13

offer. Three minutes after the conclusion of the first call, at 9:43 a.m., E. Smith purchased 1,000 shares of Triangle stock based upon the tipped information. Four minutes after the last call, at 12:00 noon, which lasted only six seconds, E. Smith purchased an additional 2,000 shares of Triangle.

47. E. Smith's final purchase of Triangle stock occurred on December 3, 2002, the day that Triangle's Board of Directors met to consider and vote on Gilead's final tender offer for Triangle. BAS representatives participated in this meeting by telephone. Specifically, at 6:30 a.m. on Tuesday, December 3, 2002, Triangle's Board held a telephonic meeting to consider the merger offer from Gilead. Triangle's CEO informed the Board and BAS' representatives that they would meet again by telephone at 6:00 p.m. at which time they would vote on the Gilead proposal.

48. During the course of the day on December 3, G. Smith tipped his father of the pending Board vote on the Gilead offer. That morning at 10:57 a.m., G. Smith called E. Smith for two minutes and 18 seconds. Almost immediately thereafter, at 11:01 a.m., based upon the tipped information, E. Smith purchased 1,000 shares of Triangle stock. Then between 11:39 a.m. and 2:23 p.m., G. Smith and E. Smith called each other six additional times. Three minutes after the last call, at 2:26 p.m., E. Smith made his final purchase of Triangle stock, acquiring 2,500 shares.

49. Late in the afternoon, on December 3, 2002, Triangle's Board unanimously approved the merger. On December 4, 2002, before the stock market opened, Triangle made a public announcement stating that it had accepted a tender offer from Gilead. The share price of Triangle's stock closed that day at $5.82, representing an increase of $1.32 per share, or 29 percent above the share price of the company's stock at the close of the stock market on the preceding day. Additionally, 31,036,852 shares of Triangle's stock traded on December 4, 2002, representing an increase of 10,311 percent from the previous day's trading volume.

50. On December 4 and 5, E. Smith sold all of the Triangle shares in his account and accounts controlled by him, including the account of Wireless, realizing $107,383 in profits.

### The Smiths' Attempted Cover-Up

51. On two occasions during the investigation, E. Smith provided the Commission's staff with fake documents that purported to demonstrate that E. Smith had reasons unrelated to the tipped nonpublic information for his purchases of Triangle and Regeneration securities.

52. First, in December 2003, E. Smith produced to the staff two documents pursuant to a Commission subpoena in connection with his Triangle trades. Each of these two documents consisted of a cover memorandum to "Account Executives" at Broadband and several attachments that G. Smith provided to E.

Smith, including attached spreadsheets, which identified numerous public issuers

that engaged in a PIPE transaction in the previous year. One of the spreadsheets

attached to a memorandum dated March 13, 2002, i.e., before E. Smith's Triangle

purchases, identified Triangle as "second" among more than 50 issuers, thereby

suggesting that PIPE investors thought Triangle was a good investment. The other

spreadsheet was attached to a memorandum dated March 10, 2003, i.e., after E.

Smith's Triangle purchases, implying that he prepared this list of PIPE issuers each

year.

53. In fact, the spreadsheets were not created on the dates reflected on the

memoranda. The spreadsheet attachments to the memoranda tendered by E. Smith

in connection with the Triangle trades were created by G. Smith between

approximately March 1, 2003 and March 4, 2003, after he learned in late February

2003, that he and E. Smith had been identified in a National Association of

Securities Dealers insider trading inquiry pertaining to Triangle stock purchases

prior to the merger announcement.

54. Second, in late April 2006, E. Smith tendered to the Commission's staff

a copy of what he described as a recently discovered memorandum from E.

Smith's work files that E. Smith purportedly had prepared on June 3, 2002, four

days prior to his purchase of Regeneration stock, and distributed to employees at

Broadband. The memorandum stated that there were "buying opportunities" in

biotech stocks that had declined in value but which had increased revenues. A spreadsheet listing such companies and two bullish research reports on Regeneration were attached to the memorandum. This purportedly demonstrated that E. Smith's Regeneration securities purchase was a result of his own independent research, rather than nonpublic information he received from his son. E. Smith represented to the Commission's staff that this memorandum and its attachments had recently been brought to his attention, which he claimed is why he had not produced them earlier.

55. In fact, the memorandum and its attachments had not been "recently discovered" or recently brought to his attention. Rather, after learning in February 2006 that the Commission's Division of Enforcement was considering recommending that the Commission charge him and G. Smith with insider trading in connection with his Regeneration trades, E. Smith created the memorandum in an effort to mislead the staff as to the true reasons for his Regeneration purchases.

56. G. Smith provided E. Smith the two research reports on Regeneration that were attached to the fraudulent memorandum. Specifically, on February 22, 2006—again after learning that the Commission's Division of Enforcement was considering recommending that the Commission charge him and his father with insider trading in connection with E. Smith's Regeneration trades—G. Smith directed a subordinate at his then current employeer to obtain copies of research

reports on Regeneration for 2001 and 2002, despite the fact that those research reports were out of date. These reports subsequently appeared as attachments to the fake memorandum that E. Smith submitted to the staff.

## COUNT I

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5] as to Defendants E. Smith and G. Smith

57. Paragraphs 1 through 56 are hereby realleged and are incorporated herein by reference.

58. From December 2001 to December 2002, the Defendants singly or in concert, in connection with the purchase and sale of securities, specifically the securities of Aspen, Regeneration, and Triangle, directly and indirectly, by the use of means and instrumentalities of interstate commerce and by use of the mails:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon persons, in connection with the purchase and sale of such securities, all as more particularly described above.

59.  The Defendants knowingly, intentionally and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, the Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard of the fact that (a) E. Smith's trading activity was based upon material nonpublic information, and (b) in trading E. Smith was (i) breaching a fiduciary relationship or other relationship of trust or confidence, or (ii) had received the information from someone breaching such a duty.

60.  By reason of the foregoing, the Defendants violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II

### Trading of Triangle Securities in Violation of Section 14(e) of the Exchange Act [15 U.S.C. 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. 240.14e.3] as to Defendants E. Smith and G. Smith

61.  Paragraphs 1 through 56 are hereby realleged and incorporated herein by reference.

62. From October 31, 2002 to December 2002, the Defendants, directly and indirectly, in connection with a tender offer or request or invitation for tenders in which a substantial step or steps to commence such tender offer had been taken, by

use of the means or instrumentalities of interstate commerce or by use of the mails, or of any facility of any national securities exchange, directly and indirectly purchased or sold or caused to be purchased or sold (G. Smith tipped E. Smith and E. Smith purchased) the securities of Triangle sought or to be sought in such tender offer, while in possession of material information relating to such tender offer that the Defendants knew or had reason to know was nonpublic and knew or had reason to know had been acquired directly or indirectly from the offering person; the issuer of the securities sought or to be sought by such tender offer; or any officer, director, partner, employee or other person acting on behalf of the offering person of such issuer.

63. The Defendants engaged in the aforementioned purchase or sale of securities sought or to be sought in such tender offer, after a substantial step or steps to commence such tender offer had been taken, while in possession of material information relating to such tender offer that the Defendants knew or had reason to know was nonpublic and knew or had reason to know had been acquired directly or indirectly from the offering person; the issuer of the securities sought or to be sought by such tender offer; or an officer, director, partner, employee or other person acting on behalf of the offering person of such issuer.

64. By reason of the foregoing, the Defendants violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays that the Court:

### I.

Issue a permanent injunction enjoining defendants G. Smith, E. Smith, and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them, from violating Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### II.

Issue a permanent injunction enjoining defendants G. Smith, E. Smith, and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them, from violating Exchange Act Section 14(e) [15 U.S.C. §78n(e)] and Rule 14e-3 thereunder [17 C.F.R. §240.14e-3].

### III.

Issue an Order requiring defendants G. Smith and E. Smith to disgorge all ill-gotten gains or losses avoided in connection with sales of Aspen, Regeneration

and Triangle common stock they made, or caused others to make, while they were in possession of material, nonpublic information as alleged in the Commission's Complaint, plus pay prejudgment interest thereon.

## IV.

Issue an Order pursuant to Section 21A of the Exchange Act [15 U.S.C. 78u-1] imposing a civil monetary penalty against defendants G. Smith and E. Smith.

## V.

Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VI.

Grant such other relief as may be necessary and appropriate.

This _____ day of September, 2007,


Respectfully Submitted,


Stephen E. Donahue (SD-5100)
William P. Hicks (not admitted in SDNY)
Mark Eric Harrison (not admitted in SDNY)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
Atlanta Regional Office
3475 Lenox Rd., N.E., Suite 500
Atlanta, Georgia 30326-1232
(404) 842-7675

Jason R. Gettinger (JG-5895)
Local Counsel for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 4300
New York, N.Y. 10281-1022
(212) 336-0076